[Cite as *State v. Malyshev*, 2019-Ohio-1087.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## JEFFERSON COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

SUMMER R. MALYSHEV,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 17 JE 0029**

---

Criminal Appeal from the
Court of Common Pleas of Jefferson County, Ohio
Case No. 16 CR 138B

**BEFORE:**
Cheryl L. Waite, Gene Donofrio, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Jane M. Hanlin,* Jefferson County Prosecutor Jefferson County Justice Center, 16001 State Route 7, Steubenville, Ohio 43952, for Plaintiff-Appellee.

*Atty. Timothy Young*, Ohio Public Defender and *Atty. Craig M. Jaquith*, Assistant State Public Defender, Office of the Ohio Public Defender, 250 E. Broad Street, Suite 1400, Columbus, Ohio 43215, for Defendant-Appellant.

Dated: March 21, 2019

---

**WAITE, P.J.**

**{¶1}** Appellant Summer R. Malyshev appeals a November 3, 2017 Jefferson County Court of Common Pleas judgment entry convicting her of aggravated murder, murder, tampering with evidence, and abuse of a corpse. Appellant argues that the trial court erroneously denied her motion to suppress incriminating statements she made while under the belief that she had immunity. Appellant also argues that the jury's finding of prior calculation and design is not supported by sufficient evidence and is against the manifest weight of the evidence. For the reasons provided, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Factual and Procedural History

**{¶2}** Appellant and Michael Shane were in a relationship. Shane had previously dated the victim in this matter. All three were known drug users and the two women were prostitutes. At some point, Appellant became jealous of the continued communication between Shane and the victim. Apparently, Shane would often text and talk to the victim on the phone in front of Appellant and would sometimes leave the room or house after the victim texted or called him.

**{¶3}** In January of 2016, Appellant and the victim were confined together at the Jefferson County Jail. Despite the fact that Shane was dating Appellant, he visited only the victim. This visit prompted a call from Appellant to Shane. During the call, Appellant complained to Shane about his visit to the victim. Appellant told him that she and the victim had argued and that she wanted to punch the victim in the face. Appellant also stated: "I meant what I said. I will kill that whore before I let her come back into your life and I mean it." (Exh. 35, 5:07.) Appellant was released from jail in early January and

returned to a house she rented with Shane. The victim was released two weeks later and resumed regular communication with Shane.

{¶4} The victim was last seen alive on January 26, 2016 with two other women. According to these women, the victim planned to meet Shane later that night. Apparently, Shane told the victim that Appellant was "faded out," meaning she was in a heroin induced trance, and they could rob her of her drugs.

{¶5} The victim's mother searched for her for two months before filing a missing person report. According to the mother, there were periods of time where she would not hear from the victim, but she had never been out of contact for more than three weeks. In August of 2016, Inmate 1, who had been confined in jail with Appellant after the disappearance of the victim, informed someone in the victim's family that Appellant had bragged about her involvement in the victim's death. The victim's mother contacted Detective Jason Hanlin ("Det. Hanlin") of the Steubenville Police Department and informed him of Inmate 1's allegations. The victim had been a confidential informant for Det. Hanlin for about a decade and he knew her well. Det. Hanlin was also familiar with Appellant.

{¶6} On August 29, 2016, Detective Thomas Ellis ("Det. Ellis") interviewed Inmate 2, another inmate who had been in jail with Appellant. Inmate 2 corroborated Inmate 1's claims. Det. Hanlin then called Appellant and asked if she would speak with him about the victim's disappearance. When Appellant informed Det. Hanlin that she did not have a ride, he offered to pick her up later that day. Although Appellant initially refused to come to the door, she eventually cooperated and accompanied Det. Hanlin to the Jefferson County Justice Center. At first, Appellant adamantly denied having any

knowledge about the victim's disappearance. Appellant continued to deny knowledge even after Det. Hanlin informed her that multiple jail inmates claimed that she had confessed to the victim's murder.

{¶7} At the time of Appellant's interview, Shane was in custody and could only be held for a total of seventy-two hours. Det. Hanlin, Prosecutor Jane Hanlin, and Sheriff Fred Abdalla discussed the manner in which they should proceed with the investigation, knowing that they would be unable to continue holding Shane. They feared Shane would flee if Appellant did not implicate him; if she did, that would then allow him to be held in connection with this crime. They offered Appellant "immunity" if she provided a full and truthful statement detailing the events leading up to the victim's disappearance. After accepting the offer, Appellant changed her story and stated that she did have knowledge of the crime and that Shane, alone, killed the victim. Appellant admitted that the murder happened in her living room but denied she participated in any way.

{¶8} According to Appellant in her videotaped interview, after the victim had been released from jail Shane initiated and maintained contact with the victim. Appellant believed that Shane should no longer speak to the victim because she, not the victim, was his girlfriend. Appellant and Shane argued. He left their house, saying that he would be right back. Appellant said that she did not believe him and assumed he left to be with the victim. Appellant stated that she was surprised when Shane returned to their house with the victim. According to Appellant, Shane and the victim then argued. In the course of this argument, he pushed her head into a wall and began choking her with his hands. Det. Hanlin asked whether some type of cord had been used in the murder, a fact that had been divulged by Inmates 1 and 2. Appellant denied that a cord was used in the

Case No. 17 JE 0029

murder. According to Appellant, after the victim was killed Shane built a makeshift sled which he used to drag her body to a fire pit in the backyard, where he burned the body. Appellant claimed she did not assist Shane. Appellant said that Shane, alone, placed the fire pit's ashes in buckets and took them to an unknown location.

{¶9} Appellant contended that sometime after the murder, she and Shane argued. He told her that he killed the victim for her, but she stated that she did not want the victim killed. Appellant opined that Shane killed the victim because if he could not have her, he did not want anyone else to have her. She also opined that Shane did not want the victim to use heroin and was angry because she had posted an ad on the "back page," an online site for prostitution.

{¶10} On August 30, 2016, investigators searched the house where Appellant had been living and discovered the fire pit, where ashes and partial bones were found. Investigators also recovered tape around the basement windows which corroborated one of the jailhouse inmate's claims that Appellant had "blacked out" the windows. Fingerprints found on the tape belonged to Appellant.

{¶11} On August 31, 2016, Det. Hanlin reinterviewed Appellant, believing she had lied during the first interview. This interview was also video recorded. The detective wanted to ensure that he had the full and accurate story before he interviewed Shane later that day. It was during this interview that Appellant, for the first time, provided facts implicating herself in the crime. For instance, Appellant admitted that a cord had been used in the murder. Appellant said she handed Shane the cord at his request but that he, alone, used it to strangle the victim. Contrary to her first interview, Appellant also admitted that she helped Shane drag the victim's body to the fire pit and that she was

present as the body burned. She also admitted that she carried the victim's ashes from the fire pit to the garage, not Shane. As the interview came to a close and Det. Hanlin was about to arrange for someone to take Appellant home, Appellant admitted she knew before Shane left to pick up the victim that he planned to lure her victim to the house on the premise of planning a robbery (which he never intended to carry out) and with the promise of drugs. Appellant had adamantly denied having any knowledge of Shane's intent to harm the victim prior to this admission.

{¶12} Det. Hanlin warned Appellant that he intended to inform Prosecutor Hanlin and Sheriff Abdalla that her story had changed and that she had lied about and omitted several important facts. He reminded her that her "deal" was contingent on a complete and truthful statement of all facts related to the murder. He insinuated that because she had lied, she would likely be arrested. Det. Hanlin then took Appellant to the jail where she was interrogated by Sheriff Abdalla. During this interview, Appellant admitted for the first time that she held one end of the cord that was around the victim's neck while Shane pulled on the other end. Det. Hanlin testified that Appellant was informed that her deal had been withdrawn after this interview and she was arrested. (6/28/17 Hrg., p. 36.)

{¶13} On September 1, 2016, Det. Hanlin conducted another interview. This third interview was again recorded on video. It is clear that this interview took place after Appellant's arrest and incarceration, as Appellant was no longer wearing civilian clothes and instead wore jail issued clothing. The interview, however, was conducted at Appellant's request. Det. Hanlin subsequently interrogated Appellant on two additional occasions, once on September 2nd and once on September 8th. Each time Appellant

continued to discuss facts related to the murder, including facts that further implicated her, despite the rescission of her deal and her arrest.

{¶14} On September 7, 2016, both Appellant and Shane were indicted on one count of murder, an unclassified felony in violation of R.C. 2903.02(A); one count of tampering with the evidence, a felony of the third degree in violation of R.C. 2921.12(A)(1); and one count of abuse of a corpse, a felony of the fifth degree in violation of R.C. 2927.01(B). On December 7, 2016, an amended indictment added one count of aggravated murder, an unclassified felony in violation of R.C. 2903.01(A), to both Appellant and Shane's charged offenses.

{¶15} On April 18, 2017, the trial court granted a motion to sever Appellant's trial from Shane's. Shane later pleaded guilty to kidnapping, voluntary manslaughter, tampering with the evidence, and abuse of a corpse. He was sentenced to twenty years of incarceration. Shane did not file an appeal.

{¶16} On August 14, 2017, the trial court denied Appellant's motion to suppress statements made during her police interviews. Appellant's trial commenced on October 2, 2017. After the conclusion of the five-day trial, the jury convicted Appellant on all four counts.

{¶17} For sentencing purposes, Appellant's murder conviction merged with her aggravated murder conviction, and the state elected to proceed on aggravated murder. The trial court accepted a joint sentencing recommendation of life imprisonment with parole eligibility after twenty-five years for the aggravated murder conviction. The trial court also sentenced Appellant to twenty-four months of incarceration for tampering with

evidence and ten months for abuse of a corpse. The sentences were ordered to run concurrently. Appellant timely appeals these convictions.

### Non-Prosecution Agreements

**{¶18}** As a threshold matter, it is important to clarify the type of agreement that was offered to Appellant during her August 29, 2016 interview as an inducement for her to give information to the investigators. Throughout this case, the parties use the phrases "immunity" and "agreement not to prosecute" interchangeably. However, these phrases are legal terms of art, having specific meaning. Resolution of their impact on this matter entails completely different analysis.

**{¶19}** In Ohio, there are three types of non-prosecution agreements: (1) a negotiated plea agreement (a plea bargain); (2) a grant of immunity; and (3) a pre-indictment agreement (where the state agrees not to prosecute a person if that person provides truthful information about a crime). *State v. Stanley*, 7th Dist. No. 99-C.A.-55, 2002-Ohio-3007, ¶ 41-48.

**{¶20}** Immunity is described and defined in R.C. 2945.44. Pursuant to R.C. 2945.44(A):

> In any criminal proceeding in this state or in any criminal or civil proceeding
>
> brought pursuant to Chapter 2981. of the Revised Code, if a witness refuses
>
> to answer or produce information on the basis of the witness's privilege
>
> against self-incrimination, the court of common pleas of the county in which
>
> the proceeding is being held, unless it finds that to do so would not further
>
> the administration of justice, shall compel the witness to answer or produce
>
> the information, if both of the following apply:

(1)  The prosecuting attorney of the county in which the proceedings are being held makes a written request to the court of common pleas to order the witness to answer or produce the information, notwithstanding the witness's claim of privilege;

(2)  The court of common pleas informs the witness that by answering, or producing the information the witness will receive immunity under division (B) of this section.

**{¶21}**  By contrast, a pre-indictment agreement not to prosecute ("non-prosecute agreement") is given to a suspect who agrees "to provide truthful information about a crime on the condition that he or she will not be prosecuted at all." *Stanley* at ¶ 48, citing *State v. Small*, 41 Ohio App.3d 252, 255, 535 N.E.2d 352 (8th Dist.1987.)  "Non-prosecution agreements made before criminal proceedings are initiated are not subject to court approval because, 'the decision whether to prosecute is discretionary and not normally subject to judicial review.' " *Stanley* at ¶ 48, citing *Mootispaw v. Eckstein*, 76 Ohio St.3d 383, 385, 667 N.E.2d 1197 (1996).  When a defendant violates a pre-indictment agreement, the state is relieved of its promise not to prosecute.  *Stanley* at ¶ 48, citing *Small*, 41 Ohio App.3d at 255.  A pre-indictment agreement is reviewed under the same contract principles as a Crim.R. 11 plea bargain.  *Stanley* at ¶ 50.  For instance, if a pre-indictment agreement is conditioned on the defendant's promise to testify, the state's promise not to prosecute is nullified if the defendant fails to testify.  *Id.*

**{¶22}** This record clearly reflects that the agreement offered by the state to Appellant was a non-prosecution agreement, conditioned on Appellant providing a complete and truthful statement to police as to the totality of the circumstances

surrounding the murder. With this in mind, we turn to our review of her assignments of error.

## ASSIGNMENT OF ERROR NO. 1

The trial court erred when it overruled Ms. Malyshev's suppression motion. Fifth and Fourteenth Amendments, United States Constitution; Article I, Section 10, Ohio Constitution. (Journal Entry—Motion to Suppress, Aug. 14, 2017.)

{¶23} Appellant argues that her confession was obtained by coercion, as it was induced by the non-prosecution agreement. She claims that she would not have made any of her statements but for her reliance on the state's promise not to prosecute her for this crime. Appellant concedes that at some point, due to her changing story, the state was entitled to withdraw the non-prosecution agreement. Thus, the narrow issue before us is whether any statements made by Appellant prior to the withdrawal of the non-prosecution agreement were the product of coercion.

{¶24} The state argues that the agreement was conditioned on Appellant providing a complete and truthful statement as to the circumstances surrounding the victim's murder. The state explains that it revoked its promise only when it became clear that Appellant failed to provide a complete and truthful statement, as she had agreed.

{¶25} A defendant's claim of coercion is reviewed by looking to the totality of the circumstances. *State v. Edwards,* 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus. Relevant factors include: (1) the defendant's age and mentality; (2) the defendant's demeanor during the interview; (3) whether the defendant was under the influence of a substance during the interview; (4) the defendant's prior criminal

experience; (5) whether the defendant was given *Miranda* rights; (6) the length of the interrogation; (7) the intensity of the interrogation; (8) the frequency of interrogation if in stages; (9) the existence of physical deprivation, mistreatment, or abuse; (10) the existence of threats; and (11) the existence of inducement. *State v. Smith*, 7th Dist. No. 15 BE 0064, 2017-Ohio-2708, ¶ 46, citing *State v. Bays*, 87 Ohio St.3d 15, 22-23, 716 N.E.2d 1126 (1999).

**{¶26}** Investigators questioned Appellant on five occasions: August 29, 2016, August 31, 2016, September 1, 2016, September 2, 2016, and September 8, 2016. The series of interviews was first prompted by information given by women who served jail sentences with Appellant. On August 28, 2016, Inmate 1 informed a member of the victim's family that Appellant had confessed details of her involvement with the victim's death. The next morning, Inmate 2 met with Det. Ellis and corroborated the information provided by Inmate 1. When Det. Ellis called Det. Hanlin to update him on Inmate 2's interview, Det. Hanlin initiated communication with Appellant.

*August 29, 2016*

**{¶27}** Det. Hanlin conducted the first interview on August 29, 2016. Although Appellant was not in custody at any point during the interview, Det. Hanlin advised her of her *Miranda* rights. The interview lasted approximately three and one-half hours. Appellant was given breaks throughout and was permitted to smoke. Appellant and Det. Hanlin had prior dealings with one another and appeared friendly and familiar with one another. Appellant stated that she was thirty-eight years old and acknowledged that she had had significant involvement with the legal system. Appellant cried at times during the interview, mostly when she claimed to be concerned for the victim.

{¶28} Appellant initially told Det. Hanlin that she last saw the victim in January when the two women served a jail sentence. Det. Hanlin advised Appellant that other women who had also served time in jail with Appellant claimed that she had confessed her involvement in the victim's murder. Appellant laughed in response to this "jailhouse story" and did not appear to be upset until Det. Hanlin informed her that she was a suspect in the victim's murder and that investigators were about to search her house.

{¶29} Appellant maintained her story that neither she nor Shane had any knowledge of the victim's disappearance. At one point, Det. Hanlin left the room and Sheriff Abdalla entered and resumed the interview. Sheriff Abdalla informed Appellant that he knew she handed Shane a cord which he used to strangle the victim, and that the victim's body was burned three or four days after the murder. Sheriff Abdalla advised Appellant that Shane was in custody and had implicated her in the murder. Despite this, she continued to deny any knowledge of the victim's disappearance.

{¶30} Although it is not shown on video, Det. Hanlin testified that the state offered Appellant a non-prosecution agreement at this point. After Appellant accepted the offer, the interview resumed with Det. Hanlin questioning Appellant, at her request. Appellant told Det. Hanlin that she and Shane argued because she knew that he had initiated and maintained communication with the victim. When he left their house, Shane told her that he would be right back. Appellant claimed that she did not believe him.

{¶31} When Shane returned, he brought the victim back with him. Appellant became animated and complained that she could not believe that Shane brought the victim to her house because she was his girlfriend, not the victim. Subsequently, Shane became angry with the victim because he believed that she had lied to him about

something. During their argument, he pushed her head into the wall and choked her with his hands. Appellant specifically stated Shane did not use a cord or rope to kill the victim. Appellant claimed that she did not assist Shane in any way. Appellant said that Shane built a makeshift sled which he used to drag the body to the fire pit, and then he burned the body. Appellant claimed that she did not even go outside while the victim's body was dragged and burned: "I swear to God I never went with him." (Exh. 24, 19:20.) Appellant stated that Shane, alone, disposed of the ashes at an unknown location.

{¶32} Det. Hanlin informed Appellant that he intended to interview Shane and needed to know her entire involvement before this interview. Det. Hanlin repeated how important it was for her to give him every detail because he had to corroborate her story in order to present a credible case against Shane. Appellant told him that she had revealed the entire story and that there were no unrevealed additional facts.

*August 31, 2016*

{¶33} Det. Hanlin conducted a second interview on August 31, 2016. Det. Hanlin permitted Appellant to take several breaks during the two and one-half hour interview. Det. Hanlin explained to Appellant that he wanted to interview her again because it appeared that the information she provided during her first interview was mostly untruthful. He said that he needed to ensure that there would be no "surprises" when he interviewed Shane later that day. (Exh. 27, 11:12.) Det. Hanlin again advised Appellant of her *Miranda* rights. Throughout the interview, Appellant was calm and composed, only showing hints of emotion when Det. Hanlin caught her in a lie.

{¶34} Appellant continued to claim in her August 29, 2016 interview that she did not go outside while Shane dragged the body to the fire pit and burned it. She later

amended her story and admitted that she went outside but did not go to the fire pit. After Det. Hanlin informed her that a neighbor saw her next to the burning fire pit on two different days, she admitted that she helped drag the body to the fire pit and was at the fire pit while the body burned. Contrary to her earlier statement, she also admitted that she, not Shane, carried buckets of the victim's ashes from the fire pit to the garage.

{¶35} Det. Hanlin reminded Appellant that Inmates 1 and 2 revealed that she told them she participated in the murder, and specifically that she and Shane used a cord to strangle the victim. At first, Appellant denied that a cord was used to kill the victim. Almost an hour later, Appellant admitted that she handed Shane a cord that he used to strangle the victim. However, Appellant adamantly denied touching the cord after giving it to Shane. When asked why she repeatedly denied even the existence of the cord in her earlier statements, Appellant claimed that she forgot. Det. Hanlin pointed out that he specifically asked her about the cord several times prior and she denied that a cord was used in the murder at all. Appellant also admitted for the first time that she knew of Shane's plan to lure the victim to the house before he left to pick up the victim. Her admission came as the interview was winding down and Det. Hanlin was arranging to have someone give her a ride home.

{¶36} Det. Hanlin repeatedly advised Appellant throughout this interview that her deal was conditioned on her complete and truthful statement about the entire chain of events. He warned her that he would have to talk to Sheriff Abdalla and Prosecutor Hanlin to update them each time that she added or changed significant details and he did not know how they would react to her constantly changing story. Det. Hanlin told her that he was on the edge of placing her in handcuffs and was considering her arrest.

**{¶37}** Det. Hanlin transported Appellant from the Jefferson County Justice Center to the jail, where Sheriff Abdalla questioned her about the cord after reading her her *Miranda* rights yet again. In this account, Appellant said Shane manually strangled the victim before asking Appellant for the cord. Appellant initially claimed that she did not touch the cord after handing it to Shane, but later admitted that she took one end of the cord on Shane's order. She then claimed that she let go of the cord once she felt it lose its "slack" from Shane pulling on the other end. Sheriff Abdalla explained that a cord cannot lose its "slack" unless it is pulled on both ends. He reminded her that Inmates 1 and 2 said she told them she and Shane both pulled on the cord while it was wrapped around the victim's neck. Appellant's response was that she did not want to go to jail, but the sheriff reminded her that her deal had been contingent on her telling the truth. Although it is not shown on the video, at that time Appellant was informed that her deal had been withdrawn. She was arrested and the interview ended. (6/28/17 Hrg., p. 36.)

*September 1, 2016*

**{¶38}** After her arrest, Det. Hanlin conducted a fourth interview, on September 1, 2016. Despite her arrest and the withdrawal of her deal, Appellant agreed to continue speaking with Det. Hanlin. Det. Hanlin read Appellant her *Miranda* rights.

**{¶39}** Appellant appeared comfortable and relaxed. She again exhibited a very friendly interaction with Det. Hanlin. During the interview, Det. Hanlin showed Appellant two cords that were found during a search of her house and matched the description she provided. Appellant stated that she did not believe that either cord was the one used in the murder, even though one was found inside the fire pit. The interview ended after three minutes.

{¶40} At Appellant's request, Det. Hanlin spoke with Appellant for thirteen minutes again later that day. Appellant joked and laughed about being unable to report to her probation officer, but said that this was the least of her worries. Det. Hanlin again advised Appellant of her *Miranda* rights. Appellant had initiated the interview because she wanted to tell Det. Hanlin that Shane earlier had told her that he wanted to "take out" several prostitutes and he also said he wanted to have "a cookout." (Exh. 29, 16:45.) She stated that he hates prostitutes, although both the victim and Appellant were prostitutes, and that he had been known to "pick up" other prostitutes. Appellant said that evidence of these statements should be in her text messages but could not remember which phone she used or which number Shane used at the time. Importantly, in this interview she told Det. Hanlin that she knew that she would be arrested and charged with murder after her August 31st interview. She conceded that now that she confessed, she had "sealed her fate." (Exh. 30, 16:49.)

*September 2, 2016*

{¶41} The sixth interview occurred on September 2, 2016. The ten-minute interview was conducted by Det. Hanlin. Det. Hanlin advised Appellant of her *Miranda* rights. Again, Appellant appeared calm and relaxed during the interview and joked with Det. Hanlin.

{¶42} Det. Hanlin informed Appellant that he could not locate any of the text messages she described in her September 1, 2016 interview and could not find the correct number to obtain records from Shane's phone. Appellant looked through her phone but apparently could not locate the information.

{¶43} Det. Hanlin asked Appellant about text messages in her phone where she accused the victim of breaking into her house. Appellant reviewed the texts and at first denied knowledge of the texts. She then stated that the victim never attempted to break into her house but that she sent those texts in an effort to get the victim arrested.

{¶44} At some point during the day, two additional women who had been in jail with Appellant came forward and provided statements detailing the story Appellant told them about her involvement in the victim's murder. According to these women, Appellant told them that she and Shane lured the victim to her house where they strangled her with a cord. Appellant also told them that she and Shane dragged the body to a fire pit in the backyard using a makeshift sled and burned the body. These statements are consistent with the ones provided by Inmates 1 and 2, and matched the details Appellant eventually gave to investigators during her August 29th and 31st interviews.

*September 8, 2016*

{¶45} The seventh, and final, interview occurred on September 8, 2016. According to Det. Hanlin, Appellant's father contacted him and informed him Appellant wanted to speak to him. Again, Det. Hanlin read Appellant her *Miranda* rights.

{¶46} Despite the fact that she had been arrested for her role in the murder and the fact that she had been informed that the agreement not to prosecute had been withdrawn, Appellant continued to revisit the facts of the murder and told Det. Hanlin that the victim mentioned her children while she pleaded for her life. Appellant again said that she could not believe Shane kept talking to "that bitch" when he was supposed to be her boyfriend. (Exh. 33, 14:35.) She also admitted for the first time that she helped Shane figure out how to dispose of the body after the murder and drove with him to several

locations to find a place to dump the body. She also mentioned for the first time that Shane duct taped the victim's hands together in order to move her and that he kept a key from a hotel he had shared with the victim that he retrieved from the victim's purse.

**{¶47}** Notably, Appellant told Det. Hanlin that people could not believe that she continued to talk to him, especially since he was so close to the victim. Appellant said, "I have no problem talking to you at all. I'm not worried about having my attorney present. There is nothing more I can do to hurt myself at this point." (Exh. 33, 14:52.) Appellant indicated a willingness to cooperate and to testify in the case against Shane. Det. Hanlin reiterated that her credibility could affect the prospect of a plea bargain. Det. Hanlin informed her that even if a plea bargain could be reached and she testified against Shane, she would still serve a prison term.

*Analysis*

**{¶48}** As previously stated, when a confession is alleged to be a product of coercion, eleven factors are weighed. The first factor looks to the defendant's age and mentality. During one of the interviews, Appellant stated that she was thirty-eight years old. There is no evidence within the record to suggest that she has any mental deficiencies.

**{¶49}** The second factor examines the defendant's demeanor. Throughout most of the interviews, Appellant was calm, composed, and at times, arrogant. She called Det. Hanlin by his first name throughout and joked with him, and it was apparent that she was comfortable talking with him. The only times she cried or showed emotion is when Det. Hanlin or Sheriff Abdalla caught her in a lie.

{¶50} The third factor looks to whether the defendant was under the influence of any substance. While it is clear that Appellant had used heroin and other drugs, there is nothing within the record to suggest that she was under the influence at any point during the interviews.

{¶51} The fourth factor reviews whether the defendant has prior experience within the legal system. It is apparent from this record that Appellant has had significant experience with the legal system and had been arrested several times, including for a felony robbery charge. Appellant also acknowledged legal problems resulting from her drug addiction and prostitution.

{¶52} The fifth factor examines whether the defendant was read her *Miranda* rights. Both Det. Hanlin and Sheriff Abdalla advised Appellant of her *Miranda* rights each time she was questioned. Appellant indicated that she understood these rights.

{¶53} The sixth factor reviews the length of the interview. The first occurred on August 29, 2016 and continued for three and one-half hours. On August 31, 2016, two interviews occurred. Combined, these lasted approximately two and one-half hours. Appellant was given several breaks throughout the August 29th and August 31st interviews. The length of the interviews was caused by Appellant's constantly changing story, amending facts, and adding new facts. Two additional interviews occurred on September 1, 2016. The earlier lasted about three minutes and the later lasted approximately thirteen minutes. The sixth interview, conducted on September 2, 2016 lasted ten minutes. The final interview occurred on September 8, 2016 and lasted approximately one-half hour. At least two of these were held at Appellant's request, one

on September 1, 2016 and another on September 8, 2016. The September 2, 2016 interview was a follow up to the one that took place on September 1, 2016.

{¶54} The seventh factor examines the intensity of the interrogations. None of the interviews were particularly intense. During the first interview, officers were still trying to determine whether the victim was alive or dead and there was a sense of urgency, however, both Det. Hanlin and Sheriff Abdalla treated Appellant respectfully. Appellant was permitted to take breaks, smoke during the interviews, and was given water. The interviews were mostly conducted by Det. Hanlin, as Appellant requested he be the interviewer. Again, Appellant repeatedly called Det. Hanlin by his first name throughout all of the interviews.

{¶55} The eighth factor reviews the frequency of the interviews, if completed in stages. These were completed in stages on the following dates: August 29, 2016; August 31, 2016; September 1, 2016; September 2, 2016; and September 8, 2016. Det. Hanlin informed Appellant that the August 31, 2016 interview was necessary because she had lied during her August 29, 2016 interview and he needed to ensure he had the complete and accurate story before he talked to Shane later that day. Appellant requested the September 1, 2016 and September 8, 2016 interviews. The remaining interview, September 2, 2016, was a limited discussion conducted to gather more information from Appellant regarding claims she made on September 1st.

{¶56} The ninth factor looks to whether there was physical deprivation, mistreatment, or abuse. Again, it is apparent that Appellant had a friendly and relaxed relationship with Det. Hanlin who conducted most of the interviews, at Appellant's specific request. Both Det. Hanlin and Sheriff Abdalla were respectful to Appellant, provided her

drinks, gave her breaks, and allowed her to smoke in the interview room. Sheriff Abdalla provided cigarettes to Appellant.

{¶57} The tenth and eleventh factors look to the existence of threats and inducement. The state concedes that Appellant was initially given a non-prosecution agreement. However, investigators repeatedly reminded Appellant from the beginning of their interactions that her deal was conditional and that she was required to provide a complete and truthful statement of the entire chain of events leading up to, and after the murder in order to reap the benefit of the deal. They warned her that because of her continual changes of story, she was on the verge of having the deal revoked.

{¶58} There is no question that Appellant was aware that her deal was revoked after the August 31, 2016 interview. Det. Hanlin testified at the suppression hearing that Appellant was informed that her deal was withdrawn and she was arrested following the interview. Appellant conceded that she knew at some point during the interview she would be arrested at its conclusion. However, even after Appellant's deal was withdrawn and she was arrested, she continued to provide statements to Det. Hanlin. In fact, Appellant requested to speak to Det. Hanlin about the case on at least two occasions after her deal was withdrawn. On September 8, 2016, Appellant told Det. Hanlin: "I have no problem talking to you at all. I'm not worried about having my attorney present. There is nothing more I can do to hurt myself at this point." (Exh. 33, 14:52.) At that same interview, Appellant stated her intention to cooperate and offered to assist investigators in their case against Shane. She acknowledged that she would receive a prison sentence regardless of her cooperation. Det. Hanlin told her that she may not be eligible for a plea deal because the information she had given them lacked credibility due to her constant

lies. Based on this record, not only did Appellant continue to make incriminating statements after she was informed that her deal was withdrawn, she clearly understood the consequences of her statements.

**{¶59}** Regardless, the information obtained during these interviews was already known to investigators, as four former jailhouse inmates gave police statements detailing the same information. A fifth gave a similar statement sometime after Appellant's arrest. Hence, the information Appellant eventually provided during her interviews merely corroborated what investigators already knew.

**{¶60}** Based on this record, none of the eleven factors weigh in Appellant's favor. Further, Appellant continued to give statements detailing information about the murder even after she was told that her non-prosecution deal had been withdrawn and was arrested for the crime. As such, this record clearly reveals her statements were not the product of coercion. Even so, investigators had knowledge of the information ultimately provided by Appellant though the statements of her former cellmates and Appellant's statements merely corroborated what investigators already knew. Accordingly, Appellant's first assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 2

Ms. Malyshev's due-process rights were violated when the trial court entered a conviction for aggravated murder in the absence of sufficient evidence. Fifth and Fourteenth Amendments, United States Constitution; Article I, Sections 10 and 16, Ohio Constitution; *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). (Amended Judgment Journal Entry—Sentencing, Nov. 3, 2017.)

{¶61} Appellant argues that the state failed to present sufficient evidence as to the "prior calculation and design" element of aggravated murder. She contends the record is devoid of any evidence to prove that she planned the method or means of the murder. As such, Appellant seeks to have this conviction reversed and to be resentenced on only the remaining convictions.

{¶62} In response, the state argues that each of the jailhouse witnesses in this case testified that Appellant confessed to not only killing the victim, but to planning the events leading up to the murder. The state highlights the testimony of the jailhouse witnesses who testified that Appellant told them that she and Shane planned to lure the victim to the house. The state cites testimony that Appellant "blacked out" the windows in the basement in preparation for the murder, which was corroborated by the fact that her fingerprints were found on tape around a basement window. The state also points to evidence that the cord used to strangle the victim was taken from either the basement or garage and placed on a chair in the living room before the victim was brought to the house.

{¶63} Appellant was convicted of R.C. 2903.01(A), which provides that: "[n]o person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy." As previously noted, Appellant challenges only whether the state presented sufficient evidence that she acted with prior calculation and design.

{¶64} "Sufficiency of the evidence is a legal question dealing with adequacy." *State v. Pepin-McCaffrey*, 186 Ohio App.3d 548, 2010-Ohio-617, 929 N.E.2d 476, ¶ 49 (7th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.3d 541 (1997).

"Sufficiency is a term of art meaning that legal standard which is applied to determine whether a case may go to the jury or whether evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Draper*, 7th Dist. No. 07 JE 45, 2009-Ohio-1023, ¶ 14, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955). When reviewing a conviction for sufficiency of the evidence, a reviewing court does not determine "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Rucci*, 7th Dist. No. 13 MA 34, 2015-Ohio-1882, ¶ 14, citing *State v. Merritt*, 7th Dist. No. 09-JE-26, 2011-Ohio-1468, ¶ 34.

**{¶65}** In reviewing a sufficiency of the evidence argument, the evidence and all rational inferences are evaluated in the light most favorable to the prosecution. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). A conviction cannot be reversed on the grounds of sufficiency unless the reviewing court determines no rational juror could have found the elements of the offense proven beyond a reasonable doubt. *Id*.

**{¶66}** The legislature intended the element of "prior calculation and design" to require more than mere instantaneous or momentary deliberation. *State v. Kerr*, 7th Dist. No. 15 MA 0083, 2016-Ohio-8479, ¶ 20. Prior calculation requires evidence "of 'a scheme designed to implement the calculated design to kill' and 'more than the few moments of deliberation permitted in common law interpretations of the former murder statute.' " *Id*.

**{¶67}** When evidence presented at trial "reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is

justified." *Id.*, citing *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 61.

**{¶68}** On review, a finding of prior calculation and design is evaluated by looking at the totality of the circumstances on a case-by-case basis. *Kerr* at ¶ 21. Prior calculation and design can be found where a defendant "quickly conceived and executed the plan to kill within a few minutes." *State v. Coley*, 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001), citing *State v. Palmer*, 80 Ohio St.3d 543, 567–568, 687 N.E.2d 685 (1997).

**{¶69}** When reviewing whether prior calculation and design has been established, Ohio courts analyze several factors. *State v. Carosiello,* 7th Dist. No. 15 CO 0017, 2017-Ohio-8160, ¶ 33. These factors include whether the defendant and victim knew each other, if the relationship was strained, whether the defendant gave thought in choosing the murder weapon or site, and whether the act was drawn out or sprung from an instantaneous eruption of events. *Id.,* citing *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 56-60.

*Relationship Between Appellant and Victim*

**{¶70}** There is no question that Appellant and the victim knew one another and that their relationship was strained. It is clear from the record that Appellant viewed the victim as her competition for Shane's affections. The victim and Shane were previously in a long-term relationship and Appellant told investigators that, even after their breakup, Shane initiated and maintained contact with the victim. Appellant admitted that she was angry that Shane continued to talk to and text the victim, often leaving the room to talk to her outside of Appellant's presence. She told investigators that she could not understand

Case No. 17 JE 0029

why Shane kept talking to "that bitch" when he was supposed to be her boyfriend. (Exh. 33, 14:35.)

{¶71} Shortly before the victim's death, Appellant and the victim were detained in jail at the same time. In a jailhouse call to Shane, Appellant complained that the victim told her that Shane visited her in the jail and told her that they could get back together if she would stop using heroin. Shane admitted to Appellant that he would still be in a relationship with the victim if not for her heroin addiction. (Exh. 35, 3:05.) He also expressed his surprise that Appellant had pursued him after his breakup with the victim. It is apparent from the call that Shane still wanted a relationship with the victim and was less sure about his relationship with Appellant.

{¶72} She complained that the victim alluded to plans she had with Shane after her release date. Appellant also told Shane that she and the victim had argued in jail and that she wanted to punch the victim in the face. During the call, Appellant stated: "I meant what I said. I will kill that whore before I let her come back into your life and I mean it." (Exh. 35, 5:07.) Following the murder, several of the jailhouse inmates told investigators that Appellant bragged that Shane finally chose her over the victim. One inmate testified that Appellant said, "[i]n a way it was a sick turn-on because for some reason he chose me to be his Bonnie and him as my Clyde." (Tr. Vol. III, p. 461.) Appellant also admitted that she unsuccessfully tried to get the victim arrested on at least two occasions to keep her away from Shane. Appellant admitted to falsely accusing the victim of breaking into her home and also to sending photographs of the victim using drugs to her probation officer in West Virginia.

*Planning*

{¶73} In addition to Appellant's jealousy of the victim, there was substantial evidence presented at trial that Appellant and Shane preplanned the murder site and weapon. As the state points out, several witnesses testified that Appellant bragged about how she and Shane orchestrated a plan to lure the victim to their house under the guise of a fake robbery and the promise of drugs. Although Appellant repeatedly denied this in her early interviews, she eventually admitted to the plan to lure the victim to the house and that she knew of this plan before Shane picked up the victim the day of the killing. We have recently held that enticing and luring a victim to a house based on a false robbery plan constitutes strong evidence of planning. See *Carosiello, supra*.

{¶74} Additionally, it is significant that the cord used to kill the victim was brought from the basement or garage and placed it on a chair in the living room, where the murder occurred, before the victim arrived. The chair had also been placed in the room shortly before the victim arrived. Luring of the victim to the house ensured that the house, specifically the living room, would be the murder site.

{¶75} The act of bringing the cord from the basement or garage to the living room is also evidence that it was chosen to be the murder weapon. While it is unclear which perpetrator brought the cord into the living room, Appellant admittedly gave it to Shane while he pinned down the victim. At the very least, Appellant knew where to immediately find the cord and facilitate the crime. Based on the above, the record shows that Appellant was involved in planning both the murder site and weapon.

*Occurrence of the Events*

{¶76} The record is replete with evidence that Appellant and Shane devised a comprehensive plan to set up the murder and then carried it out. Appellant admits the

plan began with Shane arranging to meet the victim at a Speedway gas station and bring her to the house based on the false premise they would plan a robbery and with the promise of drugs. At some point after the victim got to the house, Shane pushed the victim's head into a wall. The victim asked him if he was going to beat her and according to Appellant he responded, "[n]o, bitch, we're going to kill you." (Tr. Vol. III, p. 381.)

{¶77} Shane then choked the victim from a choke hold position until he was able to bring her to the floor, where he straddled her and manually choked her with his hands. At one point, the victim pleaded for her life and brought up her children to which Appellant responded, "shut up, whore" and kicked her in the face. (Tr. Vol. III, p. 409.) After helping Shane with the cord, which was placed around the victim's neck, Appellant and Shane each held one end of the cord and pulled. A bag was placed over the victim's head to ensure her death. It is clear from these facts that Appellant had ample time to consider her actions and to stop while the victim was still alive. Further, Appellant ignored the victim's pleas for help and instead kicked her in the face.

{¶78} Based on these facts, it is apparent that the events that occurred from the time the victim arrived until her death were "more than the few moments of deliberation permitted in common law interpretations of the former murder statute." *Kerr* at ¶ 20. Because strangulation does not cause instantaneous death, a defendant has "sufficient time and opportunity to contemplate his actions during the course of the murder, and could have chosen to stop the strangulation" prior to the victim's death. *State v. Mount,* 9th Dist. No. 26941, 2014-Ohio-5334, ¶ 31.

{¶79} We note that Appellant told several of her jailhouse inmates that she enjoyed the murder and burning the victim's body. Appellant compared the burning body

to a barbeque and a pig roast. Appellant also stated that, "[i]n a way it was a sick turn-on because for some reason he chose me to be his Bonnie and him as my Clyde." (Tr. Vol. III, p. 461.) These inmates described Appellant as laughing and joyous as she told them the events of the murder. If these witnesses were believed, as apparently they were, this leaves little question as to whether Appellant intended to cause the death of the victim, who she viewed as her rival.

**{¶80}** Based on this record, there are ample facts to support a finding of prior calculation and design. Appellant's second assignment of error is without merit and is overruled.

## ASSIGNMENT OF ERROR NO. 3

Ms. Malyshev's conviction for aggravated murder is against the manifest weight of the evidence, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). (Amended Judgment Journal Entry—Sentencing, Nov. 3, 2017.)

**{¶81}** Appellant argues that the jury's finding of prior calculation and design is against the manifest weight of the evidence. Appellant presents a conclusory argument that there is no connection between her threats regarding the victim, the animosity between them, the plans to lure the victim to the house, and the murder. Appellant additionally argues that one of the jailhouse inmates testified that the plan was to torture the victim, not kill her.

**{¶82}** Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other."

(Emphasis deleted.) *Thompkins*, 78 Ohio St.3d at 387. It is not a question of mathematics, but depends on the effect of the evidence in inducing belief. *Id.* Weight of the evidence involves the state's burden of persuasion. *Id.* at 390 (Cook, J. concurring). The appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, at 387. This discretionary power of the appellate court to reverse a conviction is to be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

{¶83} "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact is in the best position to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts. *State v. Barnhart*, 7th Dist. No. 09 JE 15, 2010-Ohio-3282, ¶ 42, citing *State v. Mastel*, 26 Ohio St.2d 170, 176, 270 20 N.E.2d 650 (1971). When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

{¶84} In a recorded phone call to Shane, Appellant stated, "I meant what I said. I will kill that whore before I let her come back into your life and I mean it." (Exh. 35, 5:07.) Appellant argues that this is insufficient to demonstrate an intent to kill the victim. However, there is ample evidence within this record to connect the statement to the murder. For instance, there is voluminous testimony from several jailhouse inmates to whom Appellant confessed her involvement in the murder while in jail. These statements are supported by Appellant's own admissions of her role in the murder, as well as her admissions that she did not want the victim around Shane because he was clearly still interested in her.

{¶85} A friend of the victim testified that she spoke to the victim the day before she disappeared. According to the witness, Shane told the victim that he planned to pick her up so they could rob Appellant of her drugs after she had passed out on heroin. (Tr. Vol. II, p. 334.) A second friend who was with the victim before her disappearance provided similar testimony.

{¶86} According to Inmate 1, who served a jail sentence with Appellant, Appellant said that a wire connected to a meat cleaver handle was used to murder the victim. Inmate 1 testified that Appellant laughed about the murder and said that a burning body smells like a barbeque. Appellant told her she "enjoyed watching a human brain boil from a skull." (Tr. Vol. III, p. 374.)

{¶87} Inmate 2, who also served a jail sentence with Appellant, also testified to comments Appellant made about the murder. Inmate 2 testified that Appellant told her that she and Shane lured the victim to her house based on a fake robbery plan. Appellant told Inmate 2 that the victim asked if they were going to beat her, Shane responded, "[n]o,

bitch we're going to kill you." (Tr. Vol. III, p. 381.) According to Inmate 2, Appellant boasted that the victim pleaded for her life and reminded them she had children and Appellant responded by kicking her in the face. Appellant seemed "thrilled" as she explained how a fire causes a person's brain to ooze out of their skull. Appellant mentioned the ashes and said, "no body, no evidence." (Tr. Vol. III, p. 385.) Inmate 2 said that Appellant relished in the details of the murder and was excited by the story.

{¶88} A third witness who also served a jail sentence with Appellant heard her discuss details of the murder. Appellant told this witness that the victim pleaded for help and Appellant said, "[s]hut up, whore" and struck her in the face. (Tr. Vol. III, p. 409.) According to the witness, Appellant gave Shane a cord which was used to strangle the victim. Appellant told the witness "she never thought that the sound of a human skull would sound so amazing from cracking from the intense heat." (Tr. Vol. III, p. 410.) Appellant also said that she punched the victim's "ticket" and that, if the witness ever needed help doing the same, she knew how to do it. (Tr. Vol. III, p. 411.) Appellant also stated that she watched the victim's "lights go out." (Tr. Vol. III, p. 411.) The witness said the victim was killed because she interfered with Appellant and Shane's relationship.

{¶89} Another former jail inmate served two jail sentences with Appellant and discussed the murder with her on both occasions. Appellant told this witness that the continued contact between Shane and the victim caused Appellant to frequently argue with Shane. Appellant said the victim was murdered because she was interfering with Appellant and Shane's relationship. Appellant told this witness Shane told her to black out the windows in the basement where they planned to torture the victim. Appellant admitted that she handled the cord and gave it to Shane. Appellant said that she used

the duct tape to bind the victim's hands and feet before she wrapped the body in a blanket. Appellant's discussions with this witness are slightly different than her conversations with the other jail inmates. Most, if not all, of these last conversations occurred while Appellant was jailed on the murder charges. The conversations with the other jail inmate witnesses occurred before law enforcement became involved in the murder.

{¶90} The final jailhouse inmate to testify said her conversations with Appellant also occurred after Appellant was jailed on the murder charges. According to this witness, Shane was supposed to bring the victim to the house where they planned to chain her up in the basement and torture her. When Shane arrived with the victim, he and the victim began arguing and Appellant told him to "[s]hut that fucking bitch up." (Tr. Vol. III, p. 459.) Shane then pushed the victim's face into a wall. The victim asked whether Shane planned to beat her and he responded, "[n]o, bitch, we're fixing to kill you." (Tr. Vol. III, p. 459.) Appellant said that she helped Shane drag the body to the fire pit using a makeshift sled. Appellant also told this witness that, "[y]ou don't know what it sounds like to hear a human skull crack and their brain sizzle due to the heat of the fire." (Tr. Vol. III, p. 460.) She also testified that Appellant said, "[i]n a way it was a sick turn-on because for some reason he chose me to be his Bonnie and him as my Clyde." (Tr. Vol. III, p. 461.)

{¶91} Materially, the information provided by all of the jailhouse inmates was corroborated by Appellant during her interviews. Although two of the inmates testified that Appellant said the original plan was to torture the victim, these stories were given to the witnesses after Appellant became aware that other jailhouse cellmates had relayed her confessions to police. Regardless, the evidence is remarkably consistent. This

record reflects no lack of evidence tying Appellant to this crime and her conviction is not, then, against the manifest weight of the evidence.

**{¶92}** Accordingly, Appellant's third assignment of error is without merit and is overruled.

Conclusion

**{¶93}** Appellant argues that the trial court erroneously admitted incriminating statements she made while under the belief that she had immunity from prosecution. Appellant also argues that the jury's finding of prior calculation and design is not supported by sufficient evidence, and is against the manifest weight of the evidence. For the reasons provided, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Donofrio, J., concurs.

Robb, J., concurs.

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Jefferson County, Ohio, is affirmed. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**