[Cite as *State v. Burton*, 2019-Ohio-2431.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                    :

    Plaintiff-Appellee,          :

                                 No. 107054

    v.                            :

JERMAEL BURTON,                  :

    Defendant-Appellant.         :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 20, 2019

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-620576-A

---

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brad Meyer, Assistant Prosecuting Attorney, *for appellee.*

Karin Coble, *for appellant.*

MICHELLE J. SHEEHAN, J.:

{¶ 1} Jermael Burton was indicted for attempted murder and multiple counts of drug trafficking and drug possession. The police had been led to a house owned by Burton's girlfriend after a gunshot victim reported to the police that he was shot in the house. In the attic of the house, the police found a large quantity of

methamphetamine, as well as crack cocaine and marijuana, tools for drug trafficking, and firearms and magazines. At the jury trial, Burton claimed he was framed by the East Cleveland police officers, who he claimed fabricated the shooting incident and conducted an illegal search of the house's attic. The jury acquitted Burton of attempted murder and felonious assault but found him guilty of the drug and firearm charges.

{¶ 2} On appeal, Burton claims his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. He also claims his trial counsel provided ineffective assistance of counsel in failing to file a motion to suppress. After a careful review of the record and applicable law, we affirm Burton's convictions.

{¶ 3} The subject house is a three-story residential home located on Noble Road in East Cleveland. The house was owned by Deanna Thomas, Burton's girlfriend, with whom he had a child. There was an apartment on the first floor and one on the second floor. On the second floor, there was also a door that led to a staircase going up to an attic area, where the police found the drugs and firearms. The state alleged Burton lived or stayed in the attic, while Burton denied he lived or stayed there.

{¶ 4} The state had the gunshot victim and four East Cleveland police officers testify; the defense provided testimony of two tenants from the house and Burton himself. These witnesses gave varying accounts of the events surrounding the alleged shooting and the police investigation of the shooting. The witnesses'

testimony is often confusing and sometimes incoherent. We summarize the testimony as follows to the best of our ability.

**Testimony Presented by the State**

{¶ 5} According to the state's witnesses, the gunshot victim, Dontaurus Kemp, went to the house on Noble Road owned by Burton's girlfriend. While knocking at a door on the second floor of the house, a man, whom Kemp later identified as Burton, "kicked the door open" and fired multiple shots at him. He ran to the street and, with a stranger's help, flagged down Officer Wilbert Nevels for assistance. While Kemp was being treated at the hospital, Officer Steven Kaleal received a dispatch call regarding the shooting. Based on the description of the house given by Kemp, Officer Kaleal went there to investigate. Burton came out of the house, and together they went to the second floor of the house, which consisted of an apartment on one side and a door leading to an attic apartment on the other side. Burton refused to allow the officer to go to the attic apartment, claiming he lived there and, with the keys from his pocket, locked the door. In the meantime, Officer Kaleal took pictures of several individuals present in the house and sent them over his phone to Officer Nevels at the hospital. Kemp identified Burton as the shooter.

{¶ 6} Detective Keven Harvey then prepared a warrant for the search of the house although, as discussed below, he included incorrect facts in the request for the warrant regarding Kemp's purpose to visit the house. In the attic, the police found firearms and ammunitions, as well as drugs and tools for drug sales.

## 1. Testimony of the Gunshot Victim

{¶ 7} The gunshot victim, Dontaurus Kemp, testified that on August 12, 2017, his friend "Unc" took him to a house next to a barbecue place on Noble Road. His friend had told him they were meeting "some girls that [they] were going to chill with." After they parked their vehicle, a light-skinned woman came to the front door and took Kemp and his friend to the second floor. Kemp's testimony was confusing as to what transpired when they were on the second floor. He testified as follows:

> So we went upstairs. We knocking on the [females'] door. So this light-skinned girl knocking on the dude's door or whatever. So she banging hard. I know you in there. I know you in there. So the two girls had music up so she tried to — like then he say, who the fuck is it, and that's when my friend said, yeah, it's us, and he kicked down the door and just shot me.

It was unclear which door Burton came out of. The prosecutor attempted to clarify Kemp's testimony, but without success.

{¶ 8} Kemp testified that, after being shot, he ran downstairs to the street. A good Samaritan put him in his vehicle's back seat and flagged down a police officer, later identified as Officer Wilbert Nevels, for assistance. The officer led them to a hospital nearby to treat Kemp's gunshot wounds.

{¶ 9} While at the hospital, Officer Nevels showed Kemp some photos on the officer's cell phone and Kemp identified Burton as the shooter. He later identified Burton again from a photo lineup at the police station. Kemp also identified Burton as the shooter in the courtroom.

{¶ 10} To show that the house the police investigated for the shooting was indeed the house he visited, Kemp testified that when he arrived at the house, there was a silver Grand Prix in the driveway, a detail that was later confirmed by the first-floor resident of the house, Darius Scott, who testified the Grand Prix was one of the two vehicles he owned.

**2. Testimony of Officer Kaleal**

{¶ 11} Officer Steven Kaleal testified that, in the evening of August 12, 2017, he responded to a call regarding a man being treated at a hospital for gunshot wounds. The man reported he went to a house next to a barbeque place on Noble Road "to visit two females" but was shot at. Upon arrival at the house, Officer Kaleal saw a resident — later identified as Darius Scott — just arriving home. The officer asked him if he had heard any gunshots, and he answered no. A woman then came out of the house, identifying herself as the resident on the second floor. Officer Kaleal determined she was not involved in the incident. Burton then emerged from the house as well. He told the officer he "lived on the third floor."

{¶ 12} Officer Kaleal then went inside the house with Burton, and they went up to the second floor. Regarding the second floor, Kaleal testified as follows:

> Then I walked another flight of stairs to the second floor. And there's an apartment to the right and then there's another apartment to the left that has stairways that go up into the upstairs bedroom. * * * [A]s I walked into the hallway, I could see a bullet hole on the right side that led into the apartment adjacent to Mr. Burton's apartment. So I knocked on the door several times to make sure nobody was in there. Finally, the residents in there came to the door. * * * It was two females and a juvenile. * * *

* * *

[T]hen I went to go upstairs to Mr. Burton's residence, and he told me point blank, you are not going up there. I said, is there anybody else up there, and he stated no. That's when he secured his door and I wasn't able to get in his apartment. And that's when we went back outside.

{¶ 13} In conjunction with Officer Kaleal's testimony, the state played several snippets from a tape recorded on the officer's body camera. The tape showed a background of what appeared to be a dark staircase and hallway. In the tape, Officer Kaleal repeatedly asked Burton who lived "upstairs." Burton can be heard saying "I stay upstairs," "nobody is up there except for me," "there is nothing upstairs," "I have keys to upstairs," and "I live upstairs." Burton appeared to be making these statements in reference to Officer Kaleal's question as to which of the two doors on the second floor was Burton's. As Kaleal testified:

His was the one on the left. I opened the door. I was able to open up there to yell to see if anybody was hurt. That's when he told me I can't go up there and he refused to cooperate. That's when I made contact with the one next door where the bullet hole was. After I was going to check that, I was going to go upstairs, but I wasn't able to after he locked the door.

{¶ 14} Officer Kaleal testified that he took photographs of the individuals in the house and sent them over his phone to Officer Nevels, who was with Kemp at the hospital. When Kemp identified Burton as the shooter, Officer Kaleal arrested Burton.

{¶ 15} Officer Kaleal testified that, because of the report of a shooting, it was necessary for the police to search the entire house for weapons and possibly

additional victims. After Burton locked the door to the attic, Officer Kaleal contacted Detective Harvey for him to obtain a search warrant. The officers searched the attic after Detective Harvey obtained a search warrant.

{¶ 16} On cross-examination, Officer Kaleal testified that he investigated the particular house based on the report that the shooting occurred in a house next to the barbecue place on Noble Road, and he was able to confirm he was in the right house because a vehicle parked in the house's driveway matched the victim's description of the vehicle that took him to the house.

### 3. Testimony of Detective Harvey

{¶ 17} Detective Harvey testified that some time past midnight on the night of the incident, he received a call regarding a gunshot victim, who was being treated at the hospital and reported he had been shot at a house on Noble Road. Burton was already in custody when Detective Harvey arrived at the house. Detective Harvey described that on the second floor of the house, there was an apartment and a door leading to a third-floor attic apartment. Detective Harvey also saw a bullet hole in the wall. After visiting the house, he prepared a search warrant and a judge signed the warrant. With the search warrant, the officers tried to gain access to the attic through the locked door but had no success. One of the officers then crawled out to a balcony and then crawled into the attic through a window.

{¶ 18} The officers did not find any additional victims, but found an assault rifle and several magazines on the floor behind a TV. Inside a wall, which appeared to be under repair, there were additional magazines and a handgun. The officers

also found methamphetamine (totaling 295 grams) and marijuana (totaling 483 grams) inside an open book bag, as well as crack cocaine (totaling 24 grams). "Cut mix," which Detective Harvey testified was commonly used by drug traffickers in preparing drugs for sale, plastic bags, and two digital scales were also found.

{¶ 19} Detective Harvey also looked for documents and items identifying the occupant of the attic area. He found a debit card, a prescription bottle, and mail bearing Burton's name. Harvey acknowledged upon cross-examination that Burton's address as listed on these items was not the Noble Road address.

{¶ 20} Detective Harvey's affidavit, which was attached to the search warrant, described the purpose of Kemp's visit to the house differently. While Kemp testified he was there to visit some women, Harvey stated the gunshot victim was at the house "attempting to purchase drugs" and that the victim stated "he was in the upstairs hallway knocking on his dealer's door when he opened the door and shot him." Upon cross-examination, when Harvey was questioned on the discrepancy, he stated that he believed at the time the victim was at the house to buy drugs.

## 4. Testimony of Officer Demarkco Johnson

{¶ 21} Officer Johnson, who arrived at the scene to assist Officer Kaleal, testified that he searched the third floor attic. He described the layout of the second floor as having "a door on the left and another door on the right, and it takes you to another flight of stairs to go up to the third floor of the home." In the attic the officers found marijuana inside a book bag, cocaine wrapped up in a curtain, and a firearm behind a TV.

### 5. Testimony of Officer Nevels

{¶ 22} Officer Wilbert Nevels came upon Kemp and a man helping him at the intersection of Euclid Avenue and Beersford Street. Officer Nevels directed them to a hospital nearby. While at the hospital, Kemp gave a description of the shooter and later identified Burton from the photos sent to Officer Nevels by Officer Kaleal.

{¶ 23} Officer Nevels prepared a report regarding the incident, which he read as part of his testimony. The report stated, in part,

> Kemp stated he and his friend [were] going upstairs to the second floor when a female by the name of Rachel began banging on the third floor demanding that that male needs to bring his ass outside. Kemp stated that male came downstairs with a firearm in his hand and began shouting some profanities and then shooting blindly.

{¶ 24} The report also stated that Burton told the police that he resided on the third floor of the house. On cross-examination, Officer Nevels affirmed that Kemp told him that "the shooter came from the third floor."

### The Defense

{¶ 25} Burton claimed to have been framed by the East Cleveland police, who fabricated the shooting incident. He claimed the police officers and Kemp all lied on the witness stand. Burton testified in his own defense and also presented testimony from two residents of the house. These residents testified Burton did not live in the house. Rather, he did maintenance work for the house and there were people they did not know "in and out of" the attic apartment.

## 1. Testimony of the Second-Floor Resident

{¶ 26} Tansunia Hougabook, referred to at trial as "TT," testified she lived in the second-floor apartment with her 5-year-old daughter. She knew Burton as the maintenance man for the house. She got off work that evening around 10:55 p.m. and arrived home shortly after 11:00 p.m. She was taking a shower when the police came. She told the police she had not heard any gunshots that night. She also testified the "bullet hole" the police saw was actually a nail hole.

{¶ 27} When asked who lived in the attic, she stated "[p]eople that I don't know. I never knew." She also stated that Burton was not one of them. Earlier that evening, she called her landlord Deanne (Burton's girlfriend) to have her toilet fixed. She testified on that night, she was supposed to pay the rent, but she did not give Burton the rent because she "was supposed to give it to her [Burton's girlfriend]." Hougabook's testimony was unclear as to whether she actually saw or talked to Burton that night. On cross-examination, Hougabook revealed that her friend "Leona" and a young male friend were in the apartment before she arrived home. She was taking a shower when the police knocked on the door, and her friends did not answer the door for three minutes.

## 2. Testimony of the First-Floor Resident

{¶ 28} Darius Scott, his girlfriend, and their young daughter lived in the first-floor apartment of the house. He knew Burton as someone who worked at the house and, to his knowledge, he did not live there. He testified there was a third-floor apartment in the house and there were usually a lot of people going in and out. He

did not know what was going on up there except that they usually had a lot of music playing. On the night of the incident, Scott arrived home around midnight to see the police at the front of the house. Earlier that night, he had called Burton to come over to get the rent money. He was surprised when the police informed him that someone had been shot in the apartment because his girlfriend would have called him to tell him about it. Regarding the silver Grand Prix parked in the driveway that Kemp saw when he arrived at the house, Scott testified that it was his vehicle. Scott also testified that after he got home, he handed Burton $600 rent money in front of the police officers.

### 3. Defendant's Testimony

{¶ 29} Burton denied living or staying in the third-floor attic apartment. He testified that in 2017, he lived in his house on Kildare Road and his girlfriend's house, going back and forth between the two. He would go the house on Noble to do some maintenance work for his girlfriend, who owned the house, or to collect rent for her. He testified he was only in the Noble house on two occasions in August 2017, one of them being on the night of the incident.

{¶ 30} Burton testified that evening, he received a call from TT around 10:30 p.m. regarding a toilet leaking. TT also indicated she had the rent money ready. Burton was also supposed to pick up the rent money from Scott after Scott got off work that night.

{¶ 31} Burton testified he arrived at the house shortly after 11 p.m. He tried to work on TT's leaking toilet. TT gave him the rent money first but then took it back

because he did not have a receipt for her. As a result, he left the house to obtain a rent receipt from his girlfriend's house. He returned to the Noble house shortly afterward to get the rent money from both TT and the other resident Scott.

{¶ 32} Notably, Burton's testimony about his two visits to the house that night was not fully corroborated by his own witnesses. Although Burton testified he first went to the house after 11 p.m. to fix the toilet and interacted with TT regarding the rent money, TT never clearly testified that she had seen or talked to Burton that evening — she testified that she came home from work and was taking a shower when the police knocked on the door.

{¶ 33} Burton testified that, when he returned to the house on the second occasion, he found three cars in the driveway. He parked his car at the parking lot adjacent to the barbeque place and then went inside the house to knock on Scott's door. No one answered the door, and he went outside the house. He saw Scott pulling into the driveway and being questioned by the police officers.

{¶ 34} The police officers then approached Burton, requested his ID, and told him someone had been shot in the house. He told the police no one had been shot in the house.

{¶ 35} Although Officer Kaleal testified the door leading to the attic was on the left, Burton testified TT's apartment was on the left instead. Officer Kaleal knocked on TT's door, while asking Burton who lived in the other apartment. When confronted with his own words heard on the tape from Officer Kaleal's body camera, Burton admitted he told Officer Kaleal that he lived "upstairs," but did so to keep the

police from searching the place without a search warrant. He also claimed that at the time he asserted he lived "upstairs," he was standing between the first floor landing and the second floor landing and, therefore, "upstairs" referred to "TT's" residence, not the attic.

{¶ 36} Burton claimed Officer Kaleal lied when he testified Burton told him he stayed "in the other door" (across from TT's apartment) and that Burton took out the keys and locked the door to the attic. He testified he never locked the door — even though Detective Harvey testified that one of the officers had to crawl into the attic through a window from the balcony in order to access to the attic.

{¶ 37} Burton also claimed all the items bearing his name — a debit card, a pill bottle, and mail — the police claimed they found in the attic area came from his Chevy Cruze. He testified that "I know for a fact that the debit card wasn't upstairs." He claimed Officers Kaleal and Nevels searched his vehicle that night, even though Officer Nevels testified that after completing the police report, he had no further involvement in this case.

{¶ 38} Burton asserted that he had never seen Kemp and did not shoot him. He claimed that the East Cleveland police fabricated the shooting incident. Burton acknowledged he had been convicted 16 years ago of some felony offenses for which he served a 5-year prison term.

{¶ 39} While Burton was charged with attempted murder, felonious assault, drug trafficking, drug possession, possessing criminal tools, and having a weapon while under disability, the jury found Burton not guilty of attempted murder and

felonious assault.  Burton received an 11-year prison term for his convictions of the drug offenses with the accompanying one-year firearm specifications, possessing criminal tools, and having a weapon while under disability.

{¶ 40} On appeal, Burton raises two assignments of error. They state:

I.   Trial counsel rendered ineffective assistance of counsel for failing to move to suppress the fruits of the search warrant.

II.  The verdicts were not supported by sufficient evidence and fell against the manifest weight of the evidence.

For ease of discussion, we address the second assignment first.

**Sufficiency of Evidence and Manifest Weight**

{¶ 41} Under the second assignment of error, Burton argues his convictions of drug trafficking, drug possession, possession of criminal tools, having a weapon while under disability, and the firearm specifications are not supported by sufficient evidence and are also against the manifest weight of the evidence.  His argument is premised on his claim that he did not possess the drugs and weapons found in the attic because he did not live or stay there.

{¶ 42} When reviewing a challenge to the sufficiency of the evidence, we review the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 43} "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the

essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶ 44} While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion. *Id.* Unlike a claim that the evidence is insufficient to support a conviction, which raises a question of law, manifest-weight challenges raise factual issues. When a defendant argues his or her conviction is against the manifest weight of the evidence, the court,

> "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

### 1. Sufficiency of Evidence

{¶ 45} Possession is defined in R.C. 2925.01(K) as "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." Possession of a controlled substance may be actual or

constructive. *State v. Mann*, 93 Ohio App.3d 301, 308, 638 N.E.2d 585 (8th Dist.1993). "Actual possession requires ownership and, or, physical control." *State v. Messer*, 107 Ohio App.3d 51, 56, 667 N.E.2d 1022 (9th Dist.1995). Constructive possession, on the other hand, exists when a person "knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession." *State v. Hankerson*, 70 Ohio St.2d 87, 434 N.E.2d 1362 (1982), syllabus. "[T]he mere fact that property is located within premises under one's control does not, of itself, constitute constructive possession. It must also be shown that the person was conscious of the presence of the object." *Hankerson* at 91.

{¶ 46} Here, the state did not present evidence of actual possession. To prove the drug and weapon charges against Burton, the state relied on evidence showing Burton constructively possessed the drugs and weapons. Therefore, the state must present sufficient evidence to show Burton was aware of their existence and able to exercise dominion and control over them. There is no doubt the state's evidence showing Burton's constructive possession of the illicit items are circumstantial only. However, constructive possession may be proved by circumstantial evidence alone. *State v. Trembly*, 137 Ohio App.3d 134, 141, 738 N.E.2d 93 (8th Dist.2000).

{¶ 47} The state presented Officer Kaleal's testimony that shows that, as he attempted to enter the attic through the second-floor door, Burton closed the door and locked the door with his keys, preventing the officer from going to the attic area. Burton can also be heard in the officer's body camera tape that "I live upstairs."

{¶ 48} Regarding drug trafficking, plastic bags and scales, as they are often used in drug trafficking, constitute circumstantial evidence for drug trafficking if found with a large quantity of drugs. *State v. Kutsar*, 8th Dist. Cuyahoga No. 89310, 2007-Ohio-6990, ¶ 19-20, citing *State v. Fain*, 5th Dist. Delaware No. 06CAAl20094, 2007-Ohio-4854 (plastic sandwich bags and digital scales are circumstantial evidence for drug trafficking), *State v. Smith*, 3d Dist. Union No. 14-01-28, 2002-Ohio-5051 (jury could consider possession of drugs, scale, baggies, and gun in conviction of trafficking), and *State v. Fry*, 9th Dist. Summit No. 23211, 2007-Ohio-3240 (presence of drugs and drug paraphernalia permit a reasonable inference that a person was preparing drugs for shipment). In this case, in addition to a large quantity of drugs, plastic bags, and digital scales, the police also found the presence of "cut mixes," which are often used to prepare drugs for sales, as Detective Harvey testified.

{¶ 49} Regarding the one-year firearm specification accompanying the drug counts, R.C. 2941.141(A) provides that a one-year mandatory prison term is imposed if the offender "had a firearm on or about his person or under his control while committing the [underlying] offense." For purposes of R.C. 2941.141(A), a weapon need not be found on the defendant's person; the weapon can be found in another room, and all that is necessary is that the defendant had the firearm on or about his person or under his control at some point during the commission of the underlying crimes. *State v. Walker*, 10th Dist. Franklin No. 14AP-905, 2016-Ohio-3185, ¶ 64; *State v. Harry*, 12th Dist. Butler No. CA2008-01-013, 2008-Ohio-6380, ¶ 53. The

evidence presented by the state showing Burton stayed in the premises where firearms and magazines were found together with a large quantity of drugs and drug trafficking tools was sufficient to establish that Burton had the firearms under his control during the commission of drug trafficking and drug possession offenses.[1]

{¶ 50} The state's evidence in this case, albeit circumstantial, constituted sufficient evidence of the drug and weapon offenses Burton was convicted of. The evidence, when viewed in a light most favorable to the prosecution, would convince the average mind of Burton's guilt beyond a reasonable doubt. The evidence presented by the state was legally sufficient to sustain Burton's convictions.

**2. Manifest Weight of the Evidence**

{¶ 51} Burton also claims his convictions are against the manifest weight of the evidence. He argues the evidence presented at trial weighs against finding him guilty of the drug and weapon charges because he produced persuasive evidence to show that the items linking him to the premises where the drugs and weapons were found were planted by the police.

---

[1] Burton cites *State v. Smith*, 8th Dist. Cuyahoga No. 93593, 2010-Ohio-4006, for his claim that a firearm must be "conveniently accessible" or "within reach" for a conviction of a firearm specification under R.C. 2941.141(A). In *Smith*, the defendant was selling drugs in the street. He tripped and fell to the ground when chased by a police officer. While the officer stood over the defendant, he reached up and grabbed the officer's gun. The two tussled over the gun, but the defendant never gained control of the gun. This court found that the state presented insufficient evidence for the gun specification charge because the gun was never under the defendant's control such that it was "conveniently accessible" to him. *Id.* at ¶ 11, citing 2 Ohio Jury Instructions (2008). *Smith* is distinguishable. Here, the state's evidence showing the presence of the weapons and drug-related items in the same room constituted sufficient circumstantial evidence that the weapons were "conveniently accessible."

{¶ 52} Burton alleged that his vehicle, a Chevy Cruze, was towed and inventoried on the night of the incident and the items bearing his name the police claimed to have been found in the attic came from his vehicle.

{¶ 53} The state maintained that Burton's vehicle was neither towed nor inventoried by the police on the night of the incident. Burton, however, alleged the state's exhibit No. 87 showed his vehicle had been inventoried by the police on the night of the incident. Exhibit No. 87 was a tow slip from St. Clair Auto Body. The slip showed a tow date of August 25, 2017. It also showed the vehicle was released to the "owner" and there was a storage charge of $17 for eight days. A box for "ECPD" — presumably East Cleveland Police Department — was checked off. In addition, Burton pointed to the state's exhibit No. 88, which appeared to be an officer's log showing certain police activities on August 12, 2017. The log contained a short-hand statement "St. Clair Auto is on scene." The state maintained that the only vehicle towed that night was the Honda Accord driven by Kemp's friend.

{¶ 54} Even assuming that exhibits Nos. 87 and 88 did show that Burton's vehicle was inventoried by the police that night, as Burton alleged, it is not conclusive evidence that the police officers planted the identifying items on the premises where the drugs and weapons were found. While Burton presented evidence showing he was framed by the police, it was squarely within the jury's purview to determine whether to believe Burton or the police officers. In addition to the items linking Burton the attic apartment, the state also produced Officer

Kaleal's testimony and snippets from his body camera where Burton can be heard saying "I live upstairs."

{¶ 55} Regarding witness credibility, we are mindful that "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). This is because the trier of fact "is in the best position to observe the witnesses' demeanor, voice inflection, and mannerisms in determining each witness's credibility." *State v. Hughes*, 8th Dist. Cuyahoga No. 81768, 2003-Ohio-2307, ¶ 26. Furthermore, "the jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts." *State v. Malyshev*, 7th Dist. Jefferson No. 17 JE 0029, 2019-Ohio-1087, ¶ 83. "When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, [the reviewing court] will not choose which one is more credible." *Id.*

{¶ 56} Having reviewed the entire record, we are not convinced that the jury in this case clearly lost its way and created such a manifest miscarriage of justice in resolving the conflict in the evidence in the state's favor that Burton's conviction of drug and weapons charges must be reversed. We do not find this to be an exceptional case where the evidence weighed heavily against the convictions and therefore we decline to exercise our discretionary power to grant a new trial. The second assignment of error is overruled.

**Ineffective Assistance of Counsel**

{¶ 57} Under the first assignment of error, Burton claims his trial counsel provided ineffective assistance in failing to file a motion to suppress the evidence on the ground that the search warrant was based on an affidavit that contained false statements. Under the Fourth Amendment to the United States Constitution, a warrant must be based on probable cause and supported by an "oath or affirmation." In *Franks v. Delaware*, 438 U.S. 154, 171-172, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the United States Supreme Court held that if a defendant makes a "substantial preliminary showing" that an affidavit supporting a search warrant contains a false statement made knowingly or with reckless disregard for the truth, the defendant is entitled to a hearing if the allegedly false statement is necessary to establish probable cause.

{¶ 58} Burton argues if his trial counsel had filed a motion to suppress and requested a hearing pursuant to *Franks*, he would have been able to demonstrate that a *Franks* hearing would be warranted in this case. He claims the hearing would have shown that the search warrant affidavit was based on false information and the trial court would have granted his motion to suppress the evidence relating to the drug and gun charges against him.

{¶ 59} The issue on appeal, however, is not whether a *Franks* hearing was warranted in this case or whether the search warrant affidavit contained knowing or reckless falsehood. Rather, because Burton's trial counsel did not file a motion to

suppress, Burton's claim regarding the validity of the search warrant is couched in terms of ineffective assistance of counsel.

{¶ 60} In order to establish a claim of ineffective assistance of counsel, Burton must prove (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 61} In Ohio, every properly licensed attorney is presumed to be competent and, therefore, a defendant claiming ineffective assistance of counsel bears the burden of proof. *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Counsel's performance will not be deemed ineffective unless and until the performance is proven to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. *State v. Iacona*, 93 Ohio St.3d 83, 105, 2001-Ohio-1292, 752 N.E.2d 937.

{¶ 62} Burton argues his counsel provided ineffective assistance by failing to file a motion to suppress and to request a hearing pursuant to *Franks,* 438 U.S. 154, 171-172, 98 S.Ct. 2674, 57 L.Ed.2d 667. As part of his assignment of error regarding the *Franks* hearing, he also argues his counsel provided ineffective assistance in failing to fully investigate his claim that the search warrant was manufactured by the police by scrutinizing (1) the discrepancy between what Detective Harvey stated in the affidavit and what the other officers knew regarding the purpose of Kemp's visit to the house, and (2) the entire contents of the tape from Officer Kaleal's body

camera, which he alleged contained statements alluding to the shooting as having occurred outside the house.

{¶ 63} We note, however, in order for Burton to claim that the police conducted an illegal search of the attic in violation of his Fourth Amendment rights, he must first establish that he has a legitimate expectation of privacy with regard to the attic. *See, e.g.*, *State v. Wilson*, 2018-Ohio-396, 106 N.E.3d 806, ¶ 18 (5th Dist.) (a defendant's Fourth Amendment rights are violated only when the police officer's conduct invades his legitimate expectation of privacy rather than a third party); and *State v. Hill*, 127 Ohio App.3d 441, 446-447, 713 N.E.2d 73 (2d Dist.1998) (Fourth Amendment rights are personal and may not be vicariously asserted), citing *Rakas v. Illinois*, 439 U.S. 128, 133-134, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In order to demonstrate an infringement of his own legitimate expectation of privacy, Burton needs to show that "'he owned the premises or that he occupied them and had dominion and control over them by leave of the owner.'" *State v. Walker*, 8th Dist. Cuyahoga No. 64048, 1993 Ohio App. LEXIS 1147, 16 (Feb. 25, 1993), quoting *United States v. Villegas*, 899 F.2d 1324 (2d Cir.1990).

{¶ 64} Yet, Burton's defense at trial is that he did not live or stay in the attic or utilize it for any residential purposes. Indeed, while he could be heard on Officer Kaleal's body camera tape stating that he lived "upstairs" and no one else lived there, he took great pains on the witness stand explaining that he lied to the police about living "upstairs" in order to prevent the East Cleveland police from their known practice of illegal search and seizures.

{¶ 65} A claim of a violation of Fourth Amendment rights underlying a motion to suppress evidence would be incompatible with Burton's defense at trial, which understandably created a "Catch-22" situation for Burton's trial counsel.

{¶ 66} If counsel had filed a motion to suppress, Burton would necessarily be claiming that he had a legitimate expectation of privacy in the attic. This posture would affect his ability to assert his defense against the drugs and firearms charges — that he did not live or stay or in the attic — should the trial court deny the motion and the case went to trial. In addition, being able to testify at trial that he only visited the house occasionally to perform maintenance work also boosted his defense against the state's claim that he came from the attic, kicked a door open, and shot Kemp. Because counsel did not file a motion to suppress, which would necessarily be predicated on an expectation of privacy in the premises, Burton retained the ability to deny on the witness stand that he did not stay or live in the attic, refuting the state's claim he came from the attic apartment and shot Kemp. This trial tactic was apparently successful, because the jury acquitted Burton of attempted murder and other charges relating to the shooting.

{¶ 67} Although we are somewhat troubled by the search warrant affidavit in this case, in evaluating Burton's claim of ineffective assistance of counsel, we are mindful that great deference should be afforded to counsel's performance and that trial tactics and strategies do not constitute a denial of effective assistance of counsel. *State v. Gooden*, 8th Dist. Cuyahoga No. 88174, 2007-Ohio-2371, ¶ 38, citing *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980). Decisions on strategy and

trial tactics are matters of professional judgment and are granted wide latitude and we will not second-guess counsel's legal tactics and maneuvers. *State v. Quinones*, 8th Dist. Cuyahoga No. 100928, 2014-Ohio-5544, ¶ 19. Accordingly, we decline to question in hindsight the strategic decision made by Burton's trial counsel regarding the motion to suppress.

{¶ 68} Furthermore, *even if* we were to conclude Burton's trial counsel should have filed a motion to suppress, we note that a trial counsel's failure to file a suppression motion does not automatically constitute ineffective assistance of counsel. *Wilson*, 2018-Ohio-396, 106 N.E.3d 806, at ¶ 13, citing *State v. Madrigal*, 87 Ohio St.3d 378, 389, 2000-Ohio-448, 721 N.E.2d 52. Counsel can only be found ineffective for failing to file the motion if the record shows the motion would have been granted and that there is a reasonable probability that the outcome of the trial would have been different if the motion had been granted. *Id.*

{¶ 69} Here, given the presumption of validity accorded to warrant affidavits which *Franks* itself recognized, it remains speculative whether Burton could successfully make a "substantial" preliminary showing that a false statement, made knowingly or with reckless disregard for truth, was included in the affidavit, and that the allegedly false statement was necessary to a finding of probable cause in this case. *Franks,* 438 U.S. at 155, 98 S.Ct. 2674, 57 L.Ed.2d 667. It is also somewhat speculative that if such a hearing were held, the trial court would find the affiant Detective Harvey acted knowingly or with a reckless disregard for the truth — rather

than negligently — and grant Burton's motion to suppress.   For all these reasons, the first assignment of error is overruled.

{¶ 70} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the common pleas court to carry this judgment into execution.  The defendant's conviction having been affirmed, any bail pending is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

FRANK D. CELEBREZZE, JR., P.J., and
RAYMOND C. HEADEN, J., CONCUR